**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————
                                            )
STEPHON BROWN,                              )
                                            )
                    Plaintiff,              )
                                            )
          v.                                )          Civil Action No. 1:17-cv-348-RDM-GMH
                                            )
DISTRICT OF COLUMBIA, *et al.*,             )
                                            )
                    Defendants.             )
—————————————————————)

**FEDERAL DEFENDANT'S MOTION**
**TO DIMISS AND FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Federal Defendant Bureau of Prisons

("BOP" or "Defendant"), through undersigned counsel, respectfully moves for summary

judgment regarding Plaintiff's request for reversal of an administrative hearing officer's decision

dismissing BOP as a respondent to Plaintiff's administrative claim regarding his alleged right to

a free appropriate public education ("FAPE").  In addition, Defendant moves to dismiss pursuant

to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) any and all remaining claims against

BOP in Plaintiff's Amended Complaint.  In support of this motion, BOP respectfully refers the

Court to the accompanying Memorandum of Points and Authorities, the Statement of Material

Facts Not in Dispute, the Declaration of Criste Bell, and the attached exhibits.

Dated: May 5, 2017                    Respectfully submitted,

                                      CHANNING D. PHILLIPS, DC Bar # 415793
                                      United States Attorney

                                      DANIEL F. VAN HORN, DC Bar # 924092
                                      Chief, Civil Division

                                      */s/      Christopher Hair*
                                      CHRISTOPHER C. HAIR
                                      PA Bar #: 306656
                                      Special Assistant U.S. Attorney
                                      Judiciary Center Building
                                      555 Fourth St., N.W.
                                      Washington, D.C. 20530
                                      Phone: (202) 252-2530
                                      Fax: (202) 252-2599
                                      christopher.hair@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
STEPHON BROWN,                            )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Civil Action No. 1:17-cv-348-RDM-GMH
                                          )
DISTRICT OF COLUMBIA, *et al.*,           )
                                          )
                    Defendants.           )
_____)

## FEDERAL DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), Federal Defendant Bureau of Prisons ("BOP") submits this statement of material facts as to which it contends there is no genuine issue.

1. Plaintiff Stephon Brown was sentenced on June 19, 2016, by the D.C. Superior Court to 24 months of imprisonment followed by 3 years of supervised release, for violating D.C. Code § 22-404(A)(2), Assault With Significant Bodily Injury Offenses Committed During Release.  (Declaration of Criste Bell at ¶ 5.)

2. Plaintiff was incarcerated at the Hazelton Federal Correctional Institution in Bruceton Mills, West Virginia ("FCI Hazelton"), on July 6, 2015, until his release from BOP custody on November 3, 2016.  (Declaration of Criste Bell at ¶ 5.)

3. On or about September 2, 2016, Plaintiff Stephon Brown filed a Due Process Complaint alleging that he is a student with a disability, as defined by the Individuals with Disabilities Education Act ("IDEA"), and that he had been denied a free appropriate public education ("FAPE").   (Pl.'s Amend. Compl., ECF No. 13, at ¶ 8.)

1

4.  On September 23, 2016, BOP filed a motion to dismiss Plaintiff's Due Process

    Complaint as to BOP.  (Pl.'s Amend. Compl., ECF No. 13, at ¶ 9.)

5.  On October 4, 2016, the Hearing Officer granted BOP's motion to dismiss and dismissed

    BOP as a party respondent to the proceeding.  (Pl.'s Amend. Compl., ECF No. 13, at ¶

    10.)

                          Respectfully submitted,

                          CHANNING D. PHILLIPS, DC Bar # 415793
                          United States Attorney

                          DANIEL F. VAN HORN, DC Bar # 924092
                          Chief, Civil Division

                          */s/      Christopher Hair*
                          CHRISTOPHER C. HAIR
                          PA Bar #: 306656
                          Special Assistant U.S. Attorney
                          Judiciary Center Building
                          555 Fourth St., N.W.
                          Washington, D.C. 20530
                          Phone: (202) 252-2530
                          Fax: (202) 252-2599
                          christopher.hair@usdoj.gov

                                    2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

STEPHON BROWN,                                 )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )          Civil Action No. 1:17-cv-348-RDM-GMH
                                               )
DISTRICT OF COLUMBIA, *et al.*,                )
                                               )
                    Defendants.                )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF FEDERAL DEFENDANT'S MOTION TO DISMISS**
**AND FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Plaintiff's Amended Complaint (the operative "Complaint") seeks reversal of an administrative hearing officer's decision dismissing BOP as a respondent to Plaintiff's administrative due process claim regarding his alleged right to a free appropriate public education ("FAPE").  (*See* Pl.'s Amend. Compl., ECF No. 13, at 14-15.)  Plaintiff also seeks compensatory education services, compensatory damages, and attorneys' fees and costs for BOP's alleged violation of the Individuals with Disabilities Education Act ("IDEA"), Revitalization Act, and Rehabilitation Act.[1]  (*Id.* at 14-15.)  For the reasons below, the Court should dismiss all of Plaintiff's claims with respect to BOP and enter summary judgment in BOP's favor with respect to the administrative hearing officer's decision.

_____

[1] As Plaintiff has been released from BOP custody, BOP can no longer provide Plaintiff with the compensatory educational services he seeks under the IDEA.  Therefore, this aspect of Plaintiff's claim is now moot.  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.")

1

## BACKGROUND

Plaintiff Stephon Brown is a twenty-year-old resident of the District of Columbia and a student with a Specific Learning Disability.  (*See* Pl.'s Amend. Compl. at ¶ 5.)  On June 19, 2015, Plaintiff was sentenced by the D.C. Superior Court to 24 months of imprisonment followed by 3 years of supervised release for violating D.C. Code § 22-2801, Robbery Offenses Committed During Release, and D.C. Code § 22-404(A)(2), Assault With Significant Bodily Injury Offenses Committed During Release.  *See* Declaration of Criste Bell (attached hereto) at ¶ 5.  Plaintiff was incarcerated at the Hazelton Federal Correctional Institution in Bruceton Mills, West Virginia ("FCI Hazelton"), on July 6, 2015, where he remained until his release from custody on November 4, 2016.  *Id.*

## PROCEDURAL HISTORY

Prior to bringing the instant lawsuit, Plaintiff Brown filed an Administrative Due Process Complaint ("Administrative Complaint") against the District of Columbia Public Schools ("DCPS"), the Office of the State Superintendent of Education ("OSSE"), and the Bureau of Prisons ("BOP") with the OSSE Office of Dispute Resolution.  (*See* Pl.'s Amend. Compl. at ¶ 8.)  Plaintiff's Administrative Complaint alleged that while he was in BOP's custody, the three respondents failed to provide Plaintiff with a FAPE in violation of his rights under the IDEA and other D.C. special education laws and regulations.  (*Id.*)  BOP moved to dismiss Plaintiff's Administrative Complaint on September 23, 2016.  (*Id.* at ¶ 9.)

In a Decision and Order dated October 4, 2016, the OSSE Hearing Officer granted BOP's motion and dismissed BOP as a party respondent to Plaintiff's Administrative Complaint.  *See* Decision and Order on Fed. Bureau of Prisons' Motion to Dismiss, 2016-0211 (D.C. OSSE Oct. 4, 2016) (attached hereto as Exhibit A) (hereinafter "Hearing Officer's Decision").

Subsequently, the Hearing Officer held a hearing and concluded that the remaining respondents (*i.e.*, DCPS and OSSE) were not responsible for providing Plaintiff with a FAPE during his incarceration in a BOP facility.  (*See* Pl.'s Amend. Compl. at ¶ 12.)  Accordingly, the Hearing Officer dismissed Plaintiff's Administrative Complaint with prejudice.  (*Id.*)  The instant lawsuit followed.

## LEGAL STANDARDS

### a.  Federal Rule of Civil Procedure 12(b)(1).

"Subject matter jurisdiction concerns the court's authority to adjudicate the type of controversy presented by the case under consideration."  *Davis & Associates v. Williams*, 892 A.2d 1144, 1148 (D.C. 2006)**.**  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, (1992).  The court is not limited to the allegations contained in the complaint.  *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64, (1987).  Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

### b.  Federal Rule of Civil Procedure 12(b)(6).

In ruling on a motion to dismiss, the adjudicating body must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  *Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 110 (D.D.C. 2008).  The plaintiff, however, must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp.*

3

*v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, the facts alleged "must be enough to raise a right to relief above the speculative level," or must be sufficient to state a claim for relief that is plausible on its face."  *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may consider, in addition to the facts alleged in the complaint, documents attached to or incorporated into the complaint by reference, as well as matters of which it may take judicial notice.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *see also Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001).

## STATUTORY AND REGULATORY FRAMEWORK

### a.  The IDEA

The IDEA authorizes the Secretary of Education to make grants to States and to provide funds to the Department of the Interior "to assist them to provide special education and related services to children with disabilities."  20 U.S.C. § 1411(a)(1).  A State is eligible for IDEA funds, however, only "if the State submits a plan that provides assurances to the Secretary [of Education] that the State has in effect policies and procedures to ensure that the State meets" certain conditions.  *Id.* at § 1412(a).  These conditions include that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21."  *Id.* at §1412(a)(1)(A).

The IDEA defines "State" as "each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas."  *Id.* at § 1401(31).  Accordingly, the IDEA "requires States receiving federal funding to make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State."  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 232 (2009).  The IDEA's implementing regulations provide that those regulations apply "to each State that receives payments under" the IDEA.  34 C.F.R. § 300.2(a).  The regulations bind not only the State, but also "all political subdivisions of the State

4

that are involved in the education of children with disabilities," including "[s]tate and local juvenile and adult correctional facilities." *Id*. at § 300.2(b)(iv).  The governing regulations do not apply to BOP or federal correctional facilities.  *See id*. at § 300.2.

In addition to making available funding directly to States that make available a FAPE, the IDEA provides that "[a] local educational agency is eligible for assistance under this subchapter for a fiscal year if such agency submits a plan that provides assurances to the State educational agency that the local educational agency meets" certain conditions, including that the local educational agency "has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412."   20 U.S.C. § 1413(a), (a)(1).  The IDEA defines "local educational agency" ("LEA") as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." *Id*. at § 1401(19)(A).

In addition to making available grants to States and LEAs that make available FAPEs, the IDEA also imposes certain procedural obligations on State agencies and LEAs that receive IDEA funding.  Specifically, the IDEA provides that "[a]ny State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."   *Id*. at § 1415(a).  The term "State educational agency" ("SEA") is defined as "the State board of education or other agency or officer primarily

responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law." *Id.* at § 1401(32).

The IDEA does not make available any funding to BOP and does not impose any obligations on BOP. *See generally* 20 U.S.C. §§ 1400 *et seq. See also* Letter from Stephanie Smith Lee, U.S. Department of Education, to Geoffrey Yudien, Vermont Department of Education (Aug. 19, 2003) ("Letter to Yudien") at 2 ("The IDEA makes no specific provision for funding educational services for individuals with disabilities through the BOP").

### b. *BOP's educational obligations*

Unlike the IDEA, which imposes obligations only on States and LEAs that accept IDEA funding, Congress has provided the precise educational obligations of BOP in another title of the U.S. Code. Specifically, in 1990 Congress specified that BOP must have in effect "a mandatory functional literacy program for all mentally capable inmates who are not functionally literate in each Federal correctional institution," and "Non-English speaking inmates shall be required to participate in an English-As-A-Second-Language program until they function at the equivalence of the eighth grade on a nationally recognized educational achievement test." *See* Pub. L. No. 101-647, § 2904 (1990), codified at 18 U.S.C. § 3624(b)(f). *See also* BOP Program Statement 5300.21, Education, Training and Leisure Time Program Standards, at 4 (Feb. 18, 2002) ("Program Statement 5300.21") (attached hereto as Exhibit B).

Then, in 1994 Congress added the requirement that BOP must have "in effect an optional General Educational Development program for inmates who have not earned a high school diploma or its equivalent." Pub. L. No. 103-322, § 20412, codified at 18 U.S.C. § 3624(b)(3). *See also* Program Statement 5300.21 at 3.

6

### c.  *The Revitalization Act*

A few years after specifying BOP's precise educational obligations, Congress enacted the

National Capital Revitalization and Self Government Improvement Act ("Revitalization Act").

*See* Pub. L. No. 105-33, Title XI (1997).   In the Revitalization Act, Congress directed that felons

sentenced under the D.C. Code will serve their sentences at BOP facilities.  *See id.* at § 11201(a),

codified at D.C. Code § 24-101(a).  In addition, Congress closed the Lorton Correctional

Complex, which had been the primary facility for housing D.C. Code offenders, directed the

transfer of the felony population there to BOP facilities, and provided that "the Bureau of Prisons

shall be responsible for the custody, care, subsistence, education, treatment and training of such

persons."  *Id.* at § 11201(b), codified at D.C. Code § 24-101(b).

## ARGUMENT

First and foremost, Plaintiff's Complaint warrants dismissal because even if BOP were

obligated under federal law to provide Plaintiff with a FAPE, which it is not, Congress has not

waived BOP's sovereign immunity from suit here.  Therefore, the Court lacks subject-matter

jurisdiction to hear Plaintiff's claims against BOP.  Second, the Hearing Officer's Decision

correctly dismissed BOP as a respondent to Plaintiff's Administrative Complaint because neither

the IDEA nor the Revitalization Act—nor any other statute—imposes an obligation on BOP to

provide a FAPE.  Accordingly, the Court should enter summary judgment in favor of BOP as

there are no genuine disputes as to any material fact in this case and BOP is entitled to judgment

as a matter of law.  For these reasons, the Court should dismiss Plaintiff's claims against BOP

and enter summary judgment in favor of BOP with respect to the Hearing Officer's Decision.

### I.      **Congress has not Waived BOP's Sovereign Immunity Here.**

Plaintiff Brown's claims against BOP should be dismissed for a second, independent

reason: they are barred by sovereign immunity.  "It is axiomatic that the United States may not

be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."
*United States v. Mitchell*, 463 U.S. 206, 212 (1983).  The federal government may waive its
sovereign immunity, but any waiver "must be unequivocally expressed in statutory text ... and
will not be implied."  *Lane v. Peña*, 518 U.S. 187, 192 (1996) (citations omitted).  Sovereign
immunity "may leave some aggrieved parties without relief, but that is inherent in the doctrine of
sovereign immunity."  *Adeleke v. United States*, 355 F.3d 144, 150-51 (2d Cir. 2004).  In
addition, "a waiver of the Government's sovereign immunity will be strictly construed, in terms
of its scope, in favor of the sovereign."  *Id*. at 192; *see also Hall v. Washington Metro. Area
Transit Auth.*, 468 A.2d 970, 972 (D.C. 1983) ("there is ample authority for the proposition that
waivers of sovereign immunity are to be read narrowly").   Without express consent, sovereign
immunity bars suit "in any court."  *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981); *see also
Wolff v. United States*, 76 F. App'x 867, 869 (10th Cir. 2003) (citing *Int'l Primate Prot. League
v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 85–86 (1991)) ("[u]nequivocally, sovereign
immunity shields the federal government from suit in state courts" as well.).  The plaintiff bears
the burden of establishing subject-matter jurisdiction.  *Lujan*, 504 U.S. at 561 (1992).

Plaintiff has not met his burden here.  In the jurisdiction section of his Complaint,
Plaintiff cites to 28 U.S.C. §§ 1331, 1367(a), and 1343, and the IDEA.  None of these statutes
abrogate the federal government's sovereign immunity from suit here.  At the outset, it is well-
settled that 28 U.S.C. §§ 1331, 1367(a), and 1343 are jurisdictional statutes and not waivers by
the federal government of its sovereign immunity.  *See Historic E. Pequots v. Salazar*, 934 F.
Supp. 2d 272, 279 n. 5 (D.D.C. 2013) (subject matter jurisdiction "cannot be based on section
1331"); *Boritz v. United States*, 685 F. Supp. 2d 113, 122 n.4 ("Section 1367 does not constitute

a waiver of sovereign immunity by the United States."); *Byrd v. Smith,* 693 F. Supp. 1199, 1201 (D.D.C. 1986) (neither Section 1343 nor 1331 constitute waivers of sovereign immunity).

Nor does the IDEA waive the federal government's sovereign immunity. The IDEA unequivocally waives State sovereign immunity for IDEA claims. *See* 20 U.S.C. § 1403. There is no analogous waiver in the IDEA for the federal government. Plaintiff's citation to 20 U.S.C. § 1415(i)(2) fails to establish subject-matter jurisdiction over BOP because that provision simply provides for judicial review of a finding or decision made pursuant to an IDEA administrative complaint regarding any state or local agency that receives IDEA funds (as discussed further below).

Because Congress has not abrogated BOP's sovereign immunity from suit, subject-matter jurisdiction is lacking. Brown's claims against BOP must therefore be dismissed.

## II.    The Hearing Officer Correctly Dismissed BOP as a Respondent to Plaintiff's Administrative Complaint.

The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to bring a civil action in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2). The burden of persuading the court that the hearing officer was incorrect rests on the party challenging the administrative determination. *See Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005). Although the reviewing court is required to base its decision "on the preponderance of the evidence," that does not, however, authorize unfettered de novo review. *See McNeil v. Dist. of Columbia*, No. 14-cv-886, 2016 WL 6637936, at *5 (D.D.C. Nov. 9, 2016) (quoting *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)) ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.").

When considering an appeal of a hearing officer's ruling, courts must give the administrative proceedings "due weight," *id.*, and "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *Roark ex rel. Roark v. Dist. of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006) (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). At the same time, the IDEA also demands "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521, because the district court is allowed to hear additional evidence at the request of a party. *See* 20 U.S.C. § 1415(i)(2)(C)(ii).

Here, the Hearing Officer granted BOP's motion to dismiss "[b]ecause the responsibility of state and local education agencies under the IDEA derives from states' receiving federal funds under the Act, the IDEA simply does not impose a corresponding duty to provide a FAPE on any federal agency[.]" *See* Hearing Officer's Decision, Ex. A, at 6. The hearing officer further explained that his "jurisdiction as a special education hearing officer is limited to due process complaints filed against (or by) public agencies, which in the IDEA definition does not include the BOP." *Id.* at 7. Accordingly, the Hearing Officer concluded that he did not have jurisdiction over BOP under the IDEA or any other law, and dismissed BOP as a party. *Id.*

### a. *The IDEA does not impose an obligation on BOP to provide a FAPE.*

Plaintiff requests this Court to reverse the Hearing Officer's Decision because BOP allegedly violated the IDEA by failing to provide Brown a FAPE. (*See* Pl.'s Amend. Compl. at ¶¶ 38, 51.) However, the plain language of the IDEA forecloses Brown's suit because the IDEA imposes no such obligation on BOP. In interpreting a statute, a court "must first 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *U.S. v. Villanueva-Sotela*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997)). "If it does, our inquiry ends and we apply

the statute's plain language." *Id.* (citing *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450 (2002)).

Here, BOP cannot violate the IDEA because that statute imposes a FAPE obligation only on "States" and "local educational agencies," and not on BOP. *See* 20 U.S.C. §§ 1412(a), 1413(a)(1). States are defined as "each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas," *id.* at § 1401(31), while local educational agencies ("LEAs") are defined as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." *Id.* at § 1401(19)(A).

The regulations that implement the IDEA specify that the responsibility for ensuring that the requirements of the IDEA are carried out ultimately falls on the State educational agency ("SEA"), *see* 34 C.F.R. § 300.149, which the IDEA defines as "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law." 20 U.S.C. § 1401(32).

Thus, the statute unambiguously places the obligation to provide a FAPE on States and LEAs, and the implementing regulations place the ultimate responsibility on SEAs. In this case, there is no plausible reading of the definitions of State, LEA, or SEA that includes BOP. Plaintiff's Administrative Complaint therefore failed to state a claim under the IDEA against BOP. *See, e.g, Klute v. Shinseki*, 797 F. Supp. 2d 12, 17 (D.D.C. 2011) (dismissing Americans

with Disabilities Act claim against the federal government because that statute prohibits discrimination by an "employer," and the federal government is not included in the statute's definition of "employer").[2]

Consistent with the plain language of the IDEA, the Department of Education has promulgated implementing regulations specifying that these regulations "[a]pply to all political subdivisions of the State that are involved in the education of children with disabilities," including the SEA, the LEA, and "State and local juvenile and adult correctional facilities."  34 C.F.R. § 300.2(b)(1).  IDEA obligations do not apply, then, to BOP or federal correctional facilities because those facilities are not a "subdivision" of any "State" within the meaning of the IDEA.

In addition to the above, the IDEA only imposes obligations on States and LEAs if they accept funding under the IDEA.  *See*, *e.g., Hester v. Dist. of Columbia*, 505 F.3d 1283, 1285 (D.C. Cir. 2007) ("The Individuals with Disabilities Education Act requires states and the District of Columbia, as a condition of their receiving federal special education funding, to provide disabled children with a 'free appropriate public education'"); *Bridges Pub. Charter Sch. v. Barrie*, 709 F. Supp. 2d 94, 95 (D.D.C. 2010) ("Under the IDEA, states and local education agencies that receive federal education assistance must establish policies and procedures to ensure that [a] free appropriate public education is available to all children with disabilities.") Funding under the IDEA is available only to States and the Secretary of the Interior (to assist

---

[2] Notably, the Administrative Complaint form utilized by Brown (attached hereto as Exhibit C) lists 7 entities against whom a complaint can be made, none of which are BOP.  *See* Ex. C at 2. Brown was forced to create a new check box in order to list BOP as a defendant on the form.

with the education of children on Native American reservations), and not to BOP.[3]  *See* 20

U.S.C. § 1411(a).  Thus, even if—despite the unambiguous language of the IDEA to the

contrary—BOP could somehow be construed as a State, SEA, or LEA, BOP cannot and does not

meet the condition (receipt of IDEA funding) that triggers the obligation to provide a FAPE.

### b.   *The Revitalization Act does not require BOP to provide a FAPE.*

Plaintiff Brown also seeks reversal of the Hearing Officer's decision based on his

assertion that under the Revitalization Act "BOP is expressly responsible for the education of

D.C. Code offenders."  (*See* Pl.'s Amend. Compl. at ¶ 38 (citing D.C. Code § 24-101).)  This

assertion lacks merit.

In passing the Revitalization Act, Congress directed that felons sentenced under the D.C.

Code "shall be designated by the Bureau of Prisons to a penal or correctional facility operated or

contracted for by the Bureau of Prisons."  D.C. Code § 24-101(a).  The Revitalization Act further

provided that the Lorton Correctional Complex, which had been the primary facility for housing

D.C. Code offenders, would be closed, the felony population residing there would be transferred

to a BOP facility, "and the Bureau of Prisons shall be responsible for the custody, care,

subsistence, education, treatment and training of such persons."  D.C. Code § 24-101(b).   Thus,

---

[3] The IDEA authorizes funding to the Secretary of the Interior "to meet the need for assistance for the education of children with disabilities on reservations . . .  enrolled in elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior." 20 U.S.C. § 1411(h)(1)(A).  The Secretary of Education may provide that funding to the Secretary of the Interior only if the Secretary of the Interior submits information that includes "an assurance that the Secretary of the Interior and the Secretary of Health and Human Services have entered into a memorandum of agreement . . . for the coordination of services, resources, and personnel between their respective Federal, State, and local offices and with State and local educational agencies and other entities to facilitate the provision of services to Indian children with disabilities residing on or near reservations."  20 U.S.C. §1411(h)(2)(E).  Thus, the federal agencies referred to in the IDEA's purposes are the Department of the Interior, the Department of Health and Human Services, and the Department of Education.   The IDEA makes no mention of BOP.

under Brown's theory, the single word "education" in Section 24-101(b) transferred to BOP all of the IDEA requirements that IDEA itself imposes only on States that receive IDEA funding.

The plain language of Section 24-101(b) cannot support this extraordinary result. There is no basis to distinguish between the District of Columbia's IDEA obligations and all of its other education obligations, of which there are many. *See* Title 38 of the D.C. Code. Thus, if the term "education" in Section 24-101(b) is read to transfer all IDEA obligations, then, presumably, it must also be read to transfer every other District of Columbia obligation related to "education," as well as every District of Columbia obligation related to "custody, care, subsistence . . . treatment and training" of its residents. D.C. Code § 24-101(b). Section 24-101(b) cannot be read naturally to support such a massive transfer of responsibility to BOP. Moreover, that is not how incarceration works. An individual does not retain his unfettered rights upon incarceration. To the contrary, "[w]hen a prisoner is lawfully incarcerated, he loses many of the rights and privileges that most citizens enjoy." *Crane v. Dretke*, 2004 WL 2870718, at *1 (N.D. Tex. Dec. 10, 2004). *See also Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995) ("Rights of all kinds are much diminished in prison").

The natural reading of Section 24-101(b) is that, when BOP took over custody of D.C. Code offenders, it assumed the same responsibilities that it owes the rest of the population over which it exercises custody. *See Chase v. Pub. Def. Serv.*, 956 A.2d 67, 72 (D.C. 2008) ("[w]hen it enacted the Revitalization Act in 1997, Congress shifted control over several criminal justice functions from the District of Columbia to the federal government"). Congress has specified precisely what those responsibilities are. With respect to education, they include making available a General Educational Development program for inmates who have not earned a high school diploma, a literacy program for inmates who are not literate, and an English program for

inmates who speak English as a second language.  *See* 18 U.S.C. §§ 3624(b)(3), (f).  Nowhere

has Congress provided that BOP's educational responsibilities include the obligations outlined in

the IDEA.  To the contrary, BOP is noticeably absent from the IDEA.

The extraordinary result urged by Brown also runs contrary to well-settled principles of

statutory construction.   First, the *expressio unius, exclusio alterius* canon "instructs that when

Congress includes one possibility in a statute, it excludes another by implication."  *Marx v. Gen.*

*Revenue Corp.*, 133 S. Ct. 1166, 1181 (2013) (citing *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S.

73, 80-81 (2002)).  Here, Congress has articulated with specificity what educational

opportunities BOP must make available to federal inmates.  *See* 18 U.S.C. §§ 3624(b)(3), (f).

Congress could have included the obligation to provide a FAPE, but it did not.  Indeed, Congress

has amended Section 3624 twice since it enacted the IDEA in 2004, *see* Pub. L. No. 110-177, §

505 (2008) and Pub. L. No. 110-199, § 251(a) (2008), and has chosen not to add the IDEA

requirements to BOP's list of educational responsibilities.

Second, reading the single word "education" in Section 24-101(b) so as to impose all

IDEA obligations on BOP would create absurd results.  BOP retains custody not only over D.C.

Code offenders, but over all prisoners who have been sentenced under subchapter D of chapter

227 of Title 18 of the U.S. Code.  *See* 18 U.S.C. § 3621.  But Section 24-101(b) applies only to

D.C. Code offenders.  Thus, under Brown's reading of Section 24-101(b), BOP would be

required to meet the plethora of IDEA requirements with respect to D.C. Code offenders, a small

subset of its prison population that is incarcerated in BOP facilities throughout the country, but

not with respect to similarly situated individuals in those same institutions who were not

sentenced under the D.C. Code.  Surely Congress would have spoken more clearly if it intended

such an incongruous result, and it is a "long-standing rule that a statute should not be construed

to produce an absurd result." *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411 (D.C. Cir. 2013).

In addition, reading the term "education" to impose all IDEA obligations on BOP would force BOP to assume those obligations without the benefit of the IDEA funding that normally triggers those obligations. *See* 20 U.S.C. § 1412(a) (only States that receive IDEA funding have a FAPE obligation). This result would be squarely inconsistent with the congressional scheme in the IDEA of providing funds to be utilized a certain way. Here, despite recently amending the IDEA, Congress has chosen not to extend its obligations to BOP. *See* Pub. L. 114-95, §§ 9107, 9215 (2015) (amending various sections of the IDEA, including its definitions and Section 2412, which imposes the FAPE obligation on States that receive IDEA funding).

### c. *The Rehabilitation Act does not require BOP to provide a FAPE.*

Although Plaintiff did not plead a violation of the Rehabilitation Act in his Administrative Complaint, Plaintiff now claims that Section 504 of the Rehabilitation Act entitles him to a FAPE. Plaintiff provides no support for this claim, which otherwise lacks merit. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794; *see also Lucas v. Dist. of Columbia*, 683 F. Supp. 2d 16, 19 (D.D.C. 2010); *Robinson v. Dist. of Columbia,* 535 F. Supp. 2d 38, 42 (D.D.C. 2008) ("Section 504 prohibits programs and entities that receive federal funding from denying benefits to, or otherwise discriminating against, a person 'solely by reason' of that individual's handicap."). In the context of cases involving children who receive benefits pursuant to the IDEA, courts have consistently recognized that in order to establish a

violation of § 504, "'something more than a mere failure to provide the free appropriate education required by [the IDEA] must be shown.'"  *Lunceford v. Dist. of Columbia,* 745 F.2d 1577, 1580 (D.C. Cir. 1984) (quoting *Monahan v. Nebraska,* 687 F.2d 1164, 1170 (8th Cir. 1982)); *see also Robinson,* 535 F. Supp. 2d at 42 (citing cases).  "Specifically, plaintiffs must show either bad faith or gross misjudgment on the part of the governmental defendants."  *Robinson,* 535 F. Supp. 2d at 42.

Here, Plaintiff does not allege that BOP failed to take any action solely because of Plaintiff's learning disability.  Rather, Plaintiff's sole claim in this case is that BOP allegedly failed to provide Plaintiff with a FAPE.  As such, Plaintiff has failed to sufficiently state a claim under the Rehabilitation Act.  *See Lunceford*, 745 F.2d at 1580.  Moreover, Plaintiff has failed to plead exhaustion with respect to his Rehabilitation Act claim, which is a jurisdictional perquisite to Plaintiff's suit.  *See Lenkiewicz v. Castro*, 118 F. Supp. 3d 255, 259-60 (D.D.C. 2015); *Mahoney v. Donovan*, 824 F. Supp. 2d 29, 58 (D.D.C. 2011).  Accordingly, this claim does no violence to the Hearing Officer's Decision and should be dismissed.

Because none of the statutes cited in Plaintiff's Complaint—and, indeed, no other statute—imposes an obligation on BOP to provide a FAPE, BOP is entitled to summary judgment in its favor regarding the Hearing Officer's Decision dismissing BOP as a respondent to Plaintiff's Administrative Complaint.  For the same reason, the additional relief requested by Plaintiff fails to state a valid claim against BOP; therefore, the Court should dismiss Plaintiff's Complaint as to BOP.

**CONCLUSION**

17

For the foregoing reasons, the Court should enter summary judgment in favor of BOP with respect to the Hearing Officer's Decision and dismiss Plaintiff's remaining claims.

Dated: May 5, 2017                         Respectfully submitted,

                                           CHANNING D. PHILLIPS, DC Bar # 415793
                                           United States Attorney

                                           DANIEL F. VAN HORN, DC Bar # 924092
                                           Chief, Civil Division

                                           _/s/_____Christopher Hair_
                                           CHRISTOPHER C. HAIR
                                           PA Bar #: 306656
                                           Special Assistant U.S. Attorney
                                           Judiciary Center Building
                                           555 Fourth St., N.W.
                                           Washington, D.C. 20530
                                           Phone: (202) 252-2530
                                           Fax: (202) 252-2599
                                           christopher.hair@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
STEPHON BROWN,                                      )
                                                    )
                        Plaintiff,                  )
                                                    )
            v.                                      )       Civil Action No. 1:17-cv-348-RDM-GMH
                                                    )
DISTRICT OF COLUMBIA, *et al.*,                     )
                                                    )
                        Defendants.                 )
_____)

**[PROPOSED] ORDER**

Upon consideration of Federal Defendant Bureau of Prison's Motion to Dismiss and for Summary Judgment, Plaintiff's opposition to Federal Defendant's motion, and the entire record, it is hereby

ORDERED that Federal Defendant's motion is granted; it is further

ORDERED that this case is DISMISSED with prejudice as to Federal Defendant.

SO ORDERED.

_____              _____
Date                                        UNITED STATES DISTRICT JUDGE

1

# EXHIBIT A

**DISTRICT OF COLUMBIA**
**OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION**
Office of Dispute Resolution
810 First Street, N.E., 2nd Floor
Washington, DC 20002

| | |
|---|---|
| STEPHON BROWN, an adult student, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | Hearing Officer:  Peter B. Vaden |
| DISTRICT OF COLUMBIA ) | |
| PUBLIC SCHOOLS, ) | Case No:  2016-0211 |
| ) | |
| D.C. OFFICE OF THE STATE ) | Date Issued:  October 4, 2016 |
| SUPERINTENDENT OF EDUCATION ) | |
| and ) | |
| ) | |
| FEDERAL BUREAU OF PRISONS, ) | |
| ) | |
| Respondents. ) | |

<u>DECISION AND ORDER ON</u>
<u>FEDERAL BUREAU OF PRISONS' MOTION TO DISMISS</u>

<u>Background</u>

In his September 2, 2016 Due Process Complaint, Petitioner, Stephon Brown,
alleges that he is a student with a disability, as defined by the Individuals with
Disabilities Education Act (IDEA), and that he has been denied a free appropriate public
education (FAPE) due to, *inter alia*, the failure of Respondents District of Columbia
Public Schools (DCPS), the D.C. Office of the State Superintendent of Education (OSSE)
and the Federal Bureau of Prisons (BOP) to provide him special education and related
services since he was convicted as an adult in D.C. court and transferred to Federal
Correctional Institution Hazelton (FCI Hazelton), a BOP facility, in June 2015.  Petitioner
also asserts IDEA claims for relief for "similarly situated" students who, like Petitioner,

are 1) District residents, 2) sentenced to a period of incarceration in an adult prison,

transferred to a Bureau of Prisons (BOP) facility to serve their sentence pursuant to the

D.C. Revitalization Act, and 4) eligible for special education.

On September 23, 2016, BOP filed a Motion to Dismiss, asserting that Student's

complaint fails to state a claim against it because neither the IDEA nor any other

statute imposes an obligation on BOP to provide a FAPE to students with disabilities.[1]

BOP also contends that even if the IDEA did impose an obligation on BOP to provide a

FAPE, BOP invokes the doctrine of sovereign immunity to bar Student's claims against

it.  On September 27, 2016, Petitioner filed a response in opposition to BOP's motion to

dismiss.  Petitioner asserts first the BOP's motion to dismiss was not timely filed and

should not be considered.  Substantively, Petitioner responds that both the IDEA and

the National Capital Revitalization and Self-Government Improvement Act of 1997 (the

Revitalization Act) may be construed to impose IDEA liability on BOP and that the U.S.

Congress has waived sovereign immunity for this type of case under the Administrative

Process Act, 5 U.S.C. § 702.  BOP filed a reply to Petitioner's response on September 30,

2016.

Analysis

Legal Standard for Motion to Dismiss

Analogizing to Rule 12(b)(6) of the Federal Rules of Civil Procedure,[2]

> "To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is plausible

---

[1] By order issued September 30, 2016, I granted in part and denied in part Respondent OSSE's motion to dismiss.  I denied Respondent DCPS' motion to dismiss.

[2] The Federal Rules of Civil Procedure are not applicable to administrative due process hearings under the IDEA and are cited here only by analogy.

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173
L.Ed.2d 868 (2009) (internal quotation marks and citation omitted). "The
plausibility standard is not akin to a 'probability requirement,' but it asks
for more than a sheer possibility that a defendant has acted unlawfully."
*Id.* (citation omitted). Although a plaintiff may survive a Rule 12(b)(6)
motion even where "recovery is very remote and unlikely[,]" the facts
alleged in the complaint "must be enough to raise a right to relief above
the speculative level [.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and
citation omitted). Moreover, a pleading must offer more than "labels and
conclusions" or a "formulaic recitation of the elements of a cause of
action[.]" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550
U.S. at 555, 127 S.Ct. 1955). If the facts as alleged, which must be taken as
true, fail to establish that a plaintiff has stated a claim upon which relief
can be granted, the Rule 12(b)(6) motion must be granted. *See, e.g., Am.
Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922
F.Supp.2d 56, 61 (D.D.C.2013).

*Ocasio v. U.S. Department of Justice*, 70 F. Supp. 3d 469, 474 (D.D.C. 2014).

For purposes of BOP's motion to dismiss, I accept as true Petitioner's allegations

that he has been determined to be a student with a disability in need of special

education and related services as defined by the IDEA; that he had a current

Individualized Education Program (IEP) when he was convicted as an adult and

transferred to FCI Hazelton in June 2015, when he was 18 years old and that he has not

been offered a free appropriate public education since being transferred to FCI

Hazelton.

1.    Failure to timely file answer to due process complaint

In his response to BOP's motion to dismiss, Petitioner asserts that I should not

consider the motion because it was not timely filed.  Petitioner asserts that at the latest,

BOP received his complaint on September 6, 2016 and BOP did not file its motion to

dismiss until September 23, 2016.  Under the IDEA regulations, a party receiving a due

process complaint must, within 10 days of receiving the due process complaint, send to

the other party a response that specifically addresses the issues raised in the due process

complaint.  *See* 34 CFR § 300.508(f).  The specific application of this procedural rule is

left to the discretion of the hearing officer so long as the determination is made in a

manner that is consistent with the student's right to a timely due process hearing.  *See*

U.S. Department of Education, *Assistance to States for the Education of Children with*

*Disabilities*, 71 Fed. Reg. 46579, 46704 (August 14, 2006);  *See, also,* Office of Dispute

Resolution, *Standard Operating Procedures*, § 303.D (Hearing officers may take the

failure to so file into consideration in determining how to proceed on a case by case

basis, considering the equities of the circumstances.)

　　　In this case, I would venture that BOP has probably never before been named as a

respondent to an IDEA due process complaint in this jurisdiction and was not aware of

the 10-day response rule.  Certainly, it was incumbent upon BOP's attorneys to

familiarize themselves with the federal and District due process hearings procedures

when served with Student's complaint and I do not take lightly their failure to do so.

Notwithstanding, I do not find that Student has been seriously prejudiced by BOP's

untimely response and his right to a timely due process hearing has not been affected.

Therefore, exercising my discretion in this procedural matter, I decline to sanction BOP

for not filing a timely response.

　　　2.　　　Hearing Officer's Jurisdiction over BOP

　　　A special education hearing officer's jurisdiction derives from the IDEA,  20

U.S.C. § 1415(b) and (c).  The Act empowers parents of a Student with a disability (or the

student himself, if over the age of majority) to file a due process complaint whenever a

public agency—

(1) Proposes to initiate or change the identification, evaluation, or educational

placement of the child or the provision of FAPE to the child; or

(2) Refuses to initiate or change the identification, evaluation, or educational

placement of the child or the provision of FAPE to the child.

34 CFR §§ 300.503, 300.507.  The IDEA regulations define "public agency" to include

State Education Agencies (SEAs), Local Education Agencies (LEAs) and Educational

Service Agencies (ESAs).  *See* 34 CFR § 300.33.

   "SEA" is defined in the IDEA as a state board of education or other agency

primarily responsible for the state supervision of public elementary schools and

secondary schools. 20 U.S.C. § 1401(32).  The term "LEA" is defined as:

> [A] public board of education or other public authority legally constituted
> within a State for either administrative control or direction of, or to
> perform a service function for, public elementary schools or secondary
> schools in a city, county, township, school district, or other political
> subdivision of a State, or for such combination of school districts or
> counties as are recognized in a State as an administrative agency for its
> public elementary schools or secondary schools.

20 U.S.C. § 1401(19)(A).  "ESA" is defined as,

> (A)  . . . a regional public multiservice agency—
>
> (i)   authorized by State law to develop, manage, and provide services or
> programs to local educational agencies; and
>
> (ii)  recognized as an administrative agency for purposes of the provision of
> special education and related services provided within public elementary schools
> and secondary schools of the State; and
>
> (B)   includes any other public institution or agency having administrative control
> and direction over a public elementary school or secondary school.

20 U.S.C. § 1401(5).  A federal agency, such as BOP, does not fit within the IDEA

definition of an SEA, LEA or ESA.

   Reported case law supports limiting IDEA liability to the designated state and

5

local agencies identified in the statute.  *See, e.g., Gadsby by Gadsby v. Grasmick*, 109

F.3d 940 (4th Cir. 1997):

> Congress carefully delineated responsibilities under IDEA, delegating
> specific duties to the SEA and specific duties to the LEA, while placing
> ultimate responsibility for compliance with the SEA. Within this scheme,
> the SEA has supervisory authority and is responsible, for example, for
> administering federal IDEA funds and establishing policies and
> procedures to ensure local compliance with IDEA. See 20 U.S.C. § 1413. To
> receive federal funds, the SEA must submit a state plan to the Secretary of
> Education setting forth its programs for compliance with IDEA. See id. §
> 1413(a). By contrast, the LEA applies to the SEA for IDEA funds, and the
> LEA is responsible for the direct provision of services under IDEA,
> including the development of an IEP for each disabled student. See  20
> U.S.C. § 1414. In addition to these provisions designating certain duties as
> the SEAs and certain duties as the LEAs, Congress included a stop-gap
> measure, under which the SEA is ultimately responsible for
> noncompliance with IDEA. See 20 U.S.C. § 1414(d)(1).

*Gadsby*, 109 F.3d at 954.  Because the responsibility of state and local education

agencies under the IDEA derives from states' receiving federal funds under the Act, the

IDEA simply does not impose a corresponding duty to provide a FAPE on any federal

agency (with the limited exception of the U.S. Department of Interior, which receives

IDEA funding for students with disabilities enrolled in schools for Indian children

operated or funded by the Secretary of the Interior.)

Petitioner appears to contend that even if the IDEA does not subject the BOP to

the jurisdiction of special education hearing officers, the Revitalization Act and the D.C.

Code confer such jurisdiction.  Petitioner argues, erroneously, that D.C. Code §

24-101(b) makes BOP responsible for, *inter alia*, the education of District residents

incarcerated for felonies.  However, the provision cited by Petitioner applies only to

such prisoners who were transferred to BOP facilities from the Lorton Correctional

Complex, which closed in 2001.  Student was, of course, never confined at the Lorton

facility.  The D.C. Code does provide that any person who has been sentenced to

6

incarceration, pursuant to the District of Columbia Official Code or the

truth-in-sentencing system as described in Code § 24-111, shall be designated by the

Bureau of Prisons to a penal or correctional facility operated or contracted for by the

Bureau of Prisons, for such term of imprisonment as the court may direct. Such persons

shall be subject to any law or regulation applicable to persons committed for violations

of laws of the United States consistent with the sentence imposed.  *See* D.C. Code §

24-101(a).  Petitioner does not explain how that provision either makes BOP subject to

the IDEA or confers jurisdiction on special education hearing officers over IDEA due

process claims against BOP.

My jurisdiction as a special education hearing officer is limited to due process

complaints filed against (or by) public agencies, which in the IDEA definition does not

include the BOP.  Therefore, I conclude that I do not have jurisdiction over the BOP

under the IDEA or any other law identified by Petitioner.  BOP's motion to dismiss shall

be granted.  Having determined that I lack jurisdiction over Petitioner's IDEA claims

against BOP, there is no need to reach the question of whether the principles of

sovereign immunity prevent BOP from being sued in an IDEA administrative

proceeding.

<u>ORDER</u>

For the reasons set forth above, Respondent Federal Bureau of Prisons' motion to

dismiss is granted.  Accordingly, the Federal Bureau of Prisons is hereby dismissed as a

party respondent to this proceeding.

IT IS SO ORDERED.

Date: October 4, 2016                    __s/   Peter B. Vaden_____
                                         Hearing Officer

cc:    Sarah Comeau, Esq.
        Clair Blumenson, Esq.
        Maya Washington, Esq.
        Zoe Thomas, Esq.
        Michael Posner, Esq
        Office of Dispute Resolution
        OSSE Division of Specialized Education
        Chief Hearing Officer

# EXHIBIT B



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

AUG 19 2003

Geoffrey A. Yudien, Esq.
Legal Counsel
Vermont Department of Education
120 State Street
Montpelier, Vermont 05620-2501

Dear Mr. Yudien:

This letter is in response to your questions regarding incarcerated youth that you asked of
Jill Harris in an electronic message. Each of your questions is restated below, followed
by the Office of Special Education Program's (OSEP's) response.

Question 1: You cite section 300.311(c)(1) of the Individuals with Disabilities Education
Act (IDEA) regulations which states that "...the IEP [individualized education program]
team of a student with a disability, who is <u>convicted</u> as an adult under State law and
incarcerated in an adult prison, may modify the student's IEP or placement if the State
has demonstrated a bona fide security or compelling penological interest that cannot
otherwise be accommodated." You ask, "Does this apply to people who are incarcerated
pre-trial?" (Emphasis added).

<u>Response.</u> Because the statute 20 USC §1414(d)(6) and regulation use specific language
referencing students with disabilities who are <u>convicted</u> as adults under State law and
incarcerated in an adult prison, OSEP believes that this specific provision contemplates
post-conviction incarcerations. This is in contrast to the provisions at 20 USC
§1412(a)(1)(B) and 34 CFR §300.122(a)(2) stating that the obligation to make a free
appropriate public education (FAPE) available does not apply with respect to children
aged 18 through 21 where State law does not require that special education and related
services be provided to those youth with disabilities who, in the educational placement
prior to their <u>incarceration</u> in an adult correctional facility were not actually identified as
being a child with a disability under Part B and those who did not have an individualized
education program under Part B.

Question 2: You ask whether there is a child find responsibility with respect to
incarcerated students aged 18 through 21 who had not been previously identified as
eligible for special education or who had not had an IEP.

<u>Response:</u> Under the IDEA, where State law creates an exception to FAPE for students
with disabilities, aged 18 through 21 who in their last educational placement prior to their
incarceration in an adult correctional facility were not identified as being a child with a
disability under the IDEA and did not have an IEP, there also is no obligation for States

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

Page 2 –Geoffrey A. Yudien, Esq.

and LEAs to identify and evaluate such individuals under Part B. However, to the extent consistent with the age ranges established under State law, States must make FAPE available to students with disabilities in adult prisons who do not fall into that exception. Therefore, States and local educational agencies (LEAs) must include in its child find system, those incarcerated youth who would be eligible to receive FAPE.

Question 3: You state that Vermont's correctional system houses inmates from other states, and also, from the federal correctional system, and ask "What are Vermont's obligations, if any, to provide FAPE for the students who are in these groups?"

Response: Individuals in the federal correctional system fall under the jurisdiction of the Federal Bureau of Prisons (BOP) within the Department of Justice. The IDEA makes no specific provision for funding educational services for individuals with disabilities through the BOP. If you would like more information regarding education programs for individuals with disabilities through the BOP, you should contact:

> Federal Bureau of Prisons
> 320 First St., NW.
> Washington, DC 20534

Part B and its implementing regulations specifically apply to all subdivisions of the State involved in the education of children with disabilities, including State and local juvenile and adult correctional facilities. 34 CFR §300.2(b)(1)(iv). Each State must ensure that FAPE is available to all children with disabilities, of eligible ages under State law, who are residing in the State. 34 CFR §300.300(a). Generally, where the student is not emancipated or of the age of majority, residency is determined by the State in which the parent or guardian resides or the State that has designated the youth as a ward of the State. Therefore, under Part B, when a youth with disabilities is referred or placed by the State into an out-of-State facility, the referring State is generally responsible for ensuring that FAPE is available to the youth during the course of the youth's placement in that facility.

Two Federal laws that are also relevant to your inquiry are Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of the Americans with Disabilities Act of 1990 (Title II). Section 504 prohibits discrimination on the basis of disability by recipients of Federal financial assistance from the Department, and Title II prohibits discrimination on the basis of disability by public entities, including public elementary and secondary school systems, regardless of receipt of Federal funds. The Department's Office for Civil Rights (OCR) enforces Section 504 and Title II, as it applies to public elementary and secondary school systems. For more information about Section 504 and Title II with respect to your inquiry, you can contact the OCR Boston Office at the following address and telephone number:

2

Page 3 —Geoffrey A. Yudien, Esq.

Boston Office
Office for Civil Rights
U.S. Department of Education
J.W. McCormack Post Office and Courthouse
Room 701,01-0061
Boston, MA 02109-4557

Telephone: 617-223-9662
FAX: 617-223-9669; TDD: 617-223-9695
Email: OCR_Boston@ed.gov

If you have any further questions, please feel free to contact Dr. Wendy Tada at 202-205-9094 or Dr. JoLeta Reynolds at 202-205-5507 (press 3).

Sincerely,

Stephanie Smith Lee
Director
Office of Special Education Programs

cc: Mr. Dennis Kane
Director of Student Support Services
Division of Special Education
Vermont Department of Education

Thomas J. Hibino
Office for Civil Rights Boston Office

3

# EXHIBIT C



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** FPI
**NUMBER:** 5300.21
**DATE:** 2/18/2002
**SUBJECT:** Education, Training and Leisure Time Program Standards

1. **[<u>PURPOSE AND SCOPE</u> §544.80.  In consideration of inmate education, occupation, and leisure-time needs, the Bureau of Prisons affords inmates the opportunity to improve their knowledge and skills through academic, occupation and leisure-time activities.  All institutions, except satellite camps, detention centers and metropolitan correctional centers, shall operate a full range of activities as outlined in this rule.]**

Satellite camps, detention centers (to include the federal transfer center), and metropolitan correctional centers are exempt from providing full education programs; however, those exempted must have, at a minimum:

- General Educational Development (GED),
- English-as-a-Second Language (ESL),
- continuing education,
- library services, parenting, and
- recreation programs.

Independent camps should provide the full range of education programs specified in this Program Statement.

The Bureau requires that uniform standards must be followed in the operation of the Bureau's education, training, and leisure-time programs.  Uniform standards are necessary for program accountability and evaluation, and for resource allocation.  In addition, experience suggests that clearly defined standards contribute to effective program management and thereby enlarge inmate education, training, and leisure activity opportunities.

**[Bracketed Bold - Rules]**
Regular Type - Implementing Information

2.  **SUMMARY OF CHANGES.**  This revision clarifies program offering requirements for the Federal Transfer Center, Oklahoma City, and professional training requirements for education and recreation staff and allows credit for some training received from operational/program reviews, correspondence courses, and the Management and Specialty Training Center (MSTC), Aurora, Colorado.

It requires education staff to include the literacy provision of the Violent Crime Control and Law Enforcement Act (VCCLEA) and the Prison Litigation Reform Act (PLRA) in the Education Handbook so inmates can be better informed of the impact of satisfactory progress in the literacy (GED) program on their Good Conduct Time (GCT).

It also clarifies the role of inmate tutors/aides, the SENTRY data reporting requirement for apprenticeship training programs, and the trade advisory committee's purpose for occupational training programs.

3.  **PROGRAM OBJECTIVES.**  The expected results of this program are:

   a.  Inmates will be advised of and afforded appropriate opportunities to improve their knowledge and skills through academic, occupation, and leisure-time programs.

   b.  Accurate and timely records and reports will be maintained about inmates, education staff, individual programs, and the education/training/leisure time programs' overall operation.

   c.  Each inmate who completes a program will receive a certificate of completion (and/or otherwise have that completion recorded in his or her file) and will receive other appropriate recognition (for example, graduation ceremonies).

   d.  Each education/recreation department will operate at a high level of professionalism through continuous self and supervisory evaluation, staff development, and communication.

   e.  Half-day work/education/recreation programs and the number of inmate participation in those programs will increase.

   f.  Inmate idleness will decrease.

4. **DIRECTIVES AFFECTED**

  a. **Directive Rescinded**

    PS 5300.17      Education, Training and Leisure-Time Program
                    Standards (9/4/96)

  b. **Directives Referenced**

    PS 5251.05      Inmate Work and Performance Pay Program
                    (12/31/98)
    PS 5300.18      Occupational Education Programs (12/23/96)
    PS 5322.11      Classification and Program Review of Inmates
                    (3/11/99)
    PS 5325.05      Release Preparation Program (7/18/96)
    PS 5350.24      English-as-a-Second Language Program (ESL)
                    (7/24/97)
    PS 5350.25      Literacy Program (GED Standard) (9/29/97)
    PS 5355.03      Parenting Program Standards (1/20/95)
    PS 5370.10      Recreation Programs, Inmates (2/23/00)

  c. Rules cited in this Program Statement are contained in
28 CFR 544.80-83.

5. **STANDARDS REFERENCED**

  a. American Correctional Association 3rd Edition Standards for
Adult Correctional Institutions: 3-4150, 3-4264, 3-4381, 3-4401,
3-4410, 3-4410-1, 3-4411, 3-4412, 3-4412-1, 3-4413, 3-4414,
3-4415, 3-4416, 3-4418, 3-4419, 3-4421, 3-4422, 3-4422-1, 3-4426,
3-4428, and 3-4447

  b. American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities: 3-ALDF-5A-02, 5B-01, 5B-02,
5B-03, 5B-04, 5C-01, 5C-02, 5C-06, 3D-24, and 2E-04

  c. American Correctional Association 3rd Edition Standards for
Administration of Correctional Agencies: 2-CO-5B-01, 2-CO-5C-01,
and 2-CO-5F-01

6. **[PROGRAM GOALS §544.81. The Warden shall ensure that an
inmate with the need, capacity, and sufficient time to serve, has
the opportunity to:**

  **a. Complete an Adult Literacy program leading to a General
Educational Development (GED) certificate and/or high school
diploma;]**

An Adult Literacy program completion is the achievement of minimum scores for issuance of a high school diploma, or equivalency credential, by the state from which the individual inmate will obtain it.

- ◆ Need is defined as not having achieved a verifiable high school diploma or equivalency certificate.

- ◆ Verification is established when an inmate furnishes a copy of the credential or official GED scores, or when the achievement is verified officially in a pre-sentence investigation report.

**[b. Complete one or more levels of English-as-a-Second Language;]**

The English-as-a-Second Language (ESL) program offers limited English-proficient inmates the opportunity to improve their English skills.

- ◆ An ESL completion is the achievement of at least a score of 225 (eighth grade proficiency) on the Comprehensive Adult Student Assessment System (CASAS) Reading Certification Test and a score of 215 on the Listening Comprehension Test, respectively.

- ◆ Need is defined as a score of less than 225 and 215 on the CASAS Reading Certification Test and Listening Comprehension Test, respectively.

**[c.  Acquire or improve marketable skill through one or more programs of Occupation Education (OE);]**

The need for occupation training will be based on the inmate's previous education and work history.  When there is no demonstrated stable work history, or no specialized education or training record to demonstrate a marketable skill, an inmate will need some form of training.  Program participation restrictions may be applied in accordance with the Occupational Education Program Statement.

Programs of occupation counseling, work experience, and/or formal training may be used (independently or in combination) to satisfy the identified need.

Ordinarily, an inmate does not receive compensation for participating in any Occupation Education program.  When

compensation is received (for example, during Apprenticeship Training), it may not exceed the amount appropriate for participation in institution or UNICOR work assignments.

An Occupation Education enrollment is to be entered into the SENTRY Education Courses (EDC) category when the inmate begins a program of study in any formal occupational skills training program.  Final action will be entered in the SENTRY EDC system when an inmate exits that program.

Successful completion is when one of the following criteria is met:

(1) **Exploratory Training.**  Achieving written criteria the institution established and approved by the Supervisor of Education.

- Exploratory programs are designed to provide an introduction to a specific occupation or a "cluster" of related occupations.

- Ordinarily, programs are less than 100 hours; however, completing predefined criteria rather than attendance must be demonstrated before awarding an exploratory level completion.

(2) **Marketable Skill Training.**  Achievement of marketable skills, marketable at least at the normal entry level for a specific occupational title or cluster of titles; **and** completion of at least 100 hours of program attendance.

- Concurrent academic education requirements such as GED completion or GED enrollment may be established for marketable skill training programs.

- Ordinarily, inmates may not be enrolled in any marketable skill training program if they have not met academic requirements previously or if they do not maintain concurrent GED enrollment.

Individual exemptions may be made, e.g., an inmate who is exempt from the GED continuing participation/promotion requirements because of **documented special learning needs**, but has the capability to learn the marketable job skills with **reasonable accommodations.**

(3) **Apprentice Training.**  Achievement of the Joint Apprenticeship Committee's requirements for a journeyman's

certificate in a U.S. Department of Labor, Bureau of
Apprenticeship and Training registered program.

The start date for tracking apprenticeship training hours in
the SENTRY-based Education Courses (EDC) category is the actual
date when the state or local apprenticeship training bureau or
council accepts an inmate into the apprenticeship program.

Education staff should use the SENTRY-based Periodic
Review/Withdrawal Record (PERW) to document training hours from
another institution and/or other relevant training history.

**[d. Complete one or more Postsecondary Education activities;]**

A Postsecondary Education program completion is receiving a
passing grade in a course an accredited postsecondary education
institution has approved for postsecondary credit.

**[e.   Complete one or more Adult Continuing Education
activities;]**

Adult Continuing Education (ACE) activities are those formal
instructional classes that are of special interest such as:

- typing,
- financial planning,
- parenting,
- refresher training in a basic skill,
- consumer education, or
- computer literacy.

Continuing education is completed when an inmate meets the
participation and achievement standards established for that
activity.

**[f.   Participate in one or more leisure, fitness, wellness or
sport activities;]**

All inmates are considered to have a need for informal
recreation and leisure activities.  Certain inmates may benefit,
because of existing medical, physical, or emotional needs, from
involvement in a more formal program.

- Such needs will be considered at initial classification
  meetings or when recommended by a member of the unit,
  psychology, medical, or recreation staff.

Completions of leisure and wellness activities will be reported

on the Education Data System (EDS) when they meet established performance criteria.

**[g.  Participate in a Release Preparation program; and]**

Release Preparation is a multi-disciplinary program that assists the inmate with specific and broad-based preparation for release back into society.  Completion of **education** portions of the release preparation program is achieved and documented in the EDS when an inmate attends and completes release preparation courses as outlined in the Program Statement on the Release Preparation Program.

All education courses entered into EDC RE** in the release preparation program must meet the requirements outlined in the Program Statement on the Release Preparation Program and be approved by the Supervisor of Education.

**[h.  Participate in Career Counseling.]**

Career Counseling will be an ongoing activity throughout the inmate's incarceration.  Individual needs will be determined by a combination of factors, e.g.,:

- educational level,
- work history,
- aptitude and interest inventories,
- specific job skills, and
- unit team recommendations.

Inmates with career counseling needs can participate in a self-help program that assists them with career planning and development.

**[Staff shall encourage each inmate to accept the responsibility to identify any specific education needs, set personal goals, and select activities, programs and/or work experiences which will help to reach those goals.]**

7.  **[GENERAL PROGRAM CHARACTERISTICS §544.82**

**a.  The Supervisor of Education shall assure that the following minimum criteria are met for the institution's education program set forth in §544.81.]**

28 CFR 544.81 refers to Section 6 of this Program Statement.

These criteria must be met before the program can be reported into the SENTRY EDC:

**[(1)   There is a written curriculum which establishes measurable behavioral objectives and procedures.]**

The Supervisor of Education must approve and teachers must follow the curriculum.

◆   The curriculum must be reviewed annually and updated as necessary.  The review will be documented.  A copy of the curriculum and its review records are to be kept in the Supervisor of Education's office.  These requirements should not apply to activities entered into EDC RN**.

**[(2)   There are clear criteria which establish minimum expectations for program completion, as well as provisions for the assessment of student progress.**

**(3)   There are provisions for periodic review of the relevancy and effectiveness of the program.**

**(4)   Unless unusual circumstances (e.g., college credit courses) exist, all programs should allow for open entry and exit, at least on a monthly basis.**

**(5)   The Supervisor of Education may establish other requirements necessary to assure that the stated goals of the program are achieved.]**

When questions exist, the Supervisor of Education is to consult with the Regional Education Administrator and document any approved deviations from minimum standards.

**[b.   Upon an inmate's completion of a program specified in §544.81, staff may issue and/or review and file a certificate when it contributes to an inmate's future plans in such a way that it validates the inmate's education and training; supports the inmate's chances of securing employment; improves the inmate's acceptance for advanced education; or enhances the inmate's opportunity for success in any other activity the inmate chooses to pursue.  The certificate will confirm that the inmate has completed the requirements to receive a certificate that fits one or a combination of the following categories:]**

28 CFR 544.81 refers to Section 6 of this Program Statement.

[(1)   Accredited certificates - high school diplomas and occupation training certificates approved or issued through local school districts, state departments of education, or other recognized accrediting educational organizations;

(2)   Postsecondary certificates and transcripts - postsecondary degrees or course certificates approved or issued through a sponsoring accredited educational institution;

(3)   General Educational Development tests - programs sponsored by the American Council on Education;

(4)   Private certificates - outside agencies, private business and industry, other than those stated in paragraph (b)(1) of this section;

(5)   Institutional certificates - approved general education, occupation training, recreation, adult continuing education and social education certificates, issued to an inmate who completes a program, and when the institution cannot provide a certificate as provided in paragraphs (b)(1) and (4) of this section; or]

[(6)   Transcripts - issued to an inmate who completes general education programs, formal occupation training, on-the-job and apprentice training and work assignments.  With the inmate's consent, transcripts may be sent to schools and colleges, business, industries and other agencies.]

c.  Each institution is to provide programs for bilingual and bicultural inmates.

◆     Reasonable efforts will be made to obtain bilingual teaching materials and resources.

d.  Standard competency based curricula must be supported by appropriate instructional materials and classroom resources.

◆     Instructional objectives are to be stated in terms which allow the performance to be observed or assessed.

Emphasis is to be placed on individual student progress and evaluation based on performance, according to established criteria.

◆     Instructors must provide and maintain individual
      student progress charts corresponding to the
      competencies identified in the curriculum.

    e.  Reasonable classroom space and supplies of necessary
equipment, including desks and chairs, audiovisual materials, and
other relevant instructional materials, should be provided for
all academic, occupation, and leisure-time programs.

    f.  Each Supervisor of Education is to ensure that academic,
occupation, and career counseling is provided to individual
inmates.  Counseling should provide assistance, encouragement,
and feedback regarding the inmate's education and occupation
program plans while incarcerated and post-release goals.

    Individualized assessment procedures (e.g., education
interview, program recommendations) should be conducted during
the Admission and Orientation (A&O).

    g.  A graduation ceremony will be held at least annually in
each institution to recognize inmates for program
accomplishments, including those in ESL, GED, occupation
training, postsecondary education, leisure-time activities, and
other programs.  Additional recognition ceremonies may be held as
needed.

8.  **HALF-DAY WORK/EDUCATION/RECREATION PROGRAM OPTION**.  At the
Warden's discretion, all sentenced inmates may be placed in the
education programs stated in Section 6 in a half-day work/
education/recreation programming option.

◆     A half-day work/education/recreation assignment is
      defined as approximately three to four hours of
      continuous education/recreation or related programming
      in the morning or afternoon.

◆     Ordinarily, inmates with half-day programming are
      assigned to regular work assignments for a half-day and
      to education/recreation, or a related program, for the
      remaining half-day.

    Ordinarily, inmates in half-day work/education/recreation
programs do not receive compensation for the education/recreation
portion of half-day work/education/recreation programs.

◆     However, local institutions may elect to pay inmates
      for participating in half-day education/recreation
      (e.g., apprenticeship training program) if resources
      permit.

When compensation is received, it may not exceed the amount
appropriate for participating in institution or UNICOR work
assignments.

9.  [**<u>INMATE TUTORS</u> §544.83.  Institutions may establish an inmate
tutor/aide program.  Guidelines shall be developed regarding the
training and supervision of inmate tutors/aides where such
programs are available.**]

When implemented effectively, an inmate tutor/aide program
provides an effective alternative to combat inmate idleness and
to promote positive use of the inmate labor force.

When feasible, institutions are encouraged to establish an inmate
tutor/aide program to use as many inmate tutors/aides as needed.

At a minimum, guidelines should address:

- The supervision, training, and certification of inmate
  tutors/aides,
- Performance pay for inmate tutors/aides,
- Position description for inmate tutors/aides, and
- Other concerns as identified locally.

Inmate tutors/aids cannot serve as the primary instructors for
the GED or ESL programs.  They can only assist Bureau staff or
contract instructors with instruction delivery.

- However, working under the general guidance and
  supervision of Bureau staff or contract instructors,
  inmate tutors/aids can teach adult continuing courses
  (ACEs) and other self improvement classes.

10.  **PROGRAM STANDARDS.**  The following standards apply to
education programs and full-time Civil Service and contract
teachers:

a.  **Instruction Time.**  All full-time teachers and education
specialists must spend at **least** 75 percent of their 40-hour
workweek in instruction or in work related to instruction, with a
minimum of 50 percent of their work hours spent in direct
classroom instruction.

- Full-time test administrators are not expected to meet
  the 50 percent direct classroom instruction
  requirement.

b.  **Adult Continuing Education.**  Adult continuing education classes are organized differently in different institutions. Additionally, non-education staff members sometimes share responsibilities for developing and supervising these activities.

Therefore, no national standards are established for class size.  However, when full time staff or fully funded contractors provide instruction, ordinarily at least 15 students should be considered necessary to justify program continuation.

c.  **Accreditation.**  Whenever feasible, education and occupation programs are to be accredited by a state or other recognized accreditation association or agency.  When a regional branch of the American Association of Colleges and Schools provides for the accreditation of "optional" or "special" schools, institutions should be accredited by that agency, if it can be achieved cost effectively.

When there is no feasible method of accrediting the entire department, special efforts should be made to gain independent certification for each occupation training program.

Certification tests from organizations (e.g., National Occupational Competency Testing Institute, American Service of Excellence) may also be administered to individual inmates upon completing a specific occupational training program.

◆     However, the individual skill competency certification should not replace a training program's certification.

d.  **Schedule.**  The education program will operate on a 12-month basis with minimum break periods for holidays.

e.  **Program Hours.**  Education activities are to be scheduled at least eight hours per day, Monday through Friday.  (The hours need not be consecutive; e.g., 8:00 - 11:00 AM, 12:30 - 3:30 PM, and  6:00 - 8:00 PM are acceptable).

◆     Friday evening education activities may be eliminated when there are eight hours of combined Saturday or Sunday education activities.

Recreation activities will be programmed at least eight hours per day, Monday through Friday, to include both afternoons and evenings and at least 12 hours per day on weekends.

◆   Special weekday morning recreation supervision may be
required when a significant group of inmates would not
have access to exercise areas in the evening because of
work assignment conflicts.

f.   **Mandatory Education Program Hours.**   Each mandatory
education class session (literacy and ESL), to include special
learning needs (SLN) class, must meet a minimum of one and one
half hours per day.   Daily class sessions may be longer,
contingent upon local institution resources and needs.   Program
hours should be consistent with the Literacy and ESL Program
Statements.

g.   **Weekend Programs.**   Weekend education service operation is
encouraged when staff resources and the facility's location
permit.

h.   **Teacher Evaluations.**   The Supervisor of Education shall
ensure that annual formal class observations are conducted for
all teachers.   The Supervisor of Education shall provide feedback
to the teacher about the overall quality of the classroom
environment.   This may include descriptive comments about
classroom structure and discipline, student participation and
motivation, and lesson preparation.

i.   **Staff Training.**   The Supervisor of Education and the
Supervisor of Recreation are to ensure that at least 48 hours of
training are provided every three fiscal years to the appropriate
education/recreation staff members as described below.

◆   This 48 hour requirement may include the 8 hour per
year, discipline specific training incorporated in
Annual Refresher Training.   All other mandatory
training will not be counted toward the 48 hour
requirement.

The training should be in two broad areas, with 20 - 28 hours
in each area, for a total of 48 hours every three fiscal years.
Regional training in education/recreation services can be applied
to both areas.

(1)   **Professional development which specifically relates to
the education/recreation discipline.**   The intent of this type of
training is to ensure that education and recreation professional
staff stay abreast of the current thinking and trends in their
discipline's professional community.

This can be accomplished through department-wide retreats, off-site training, correspondence courses, or other appropriate methods.

◆ When department-wide retreats are conducted to provide this type of training, the training must be provided by outside speakers or Bureau staff knowledgeable of current education or recreation theories and practices.

◆ The subjects covered at these department-wide training sessions must relate to broad education or recreation professional development, not Bureau policies and practices.  Subjects may include:

- learning styles and assessments,
- tournament organization and management,
- vocational training standards,
- language acquisitions, and
- other appropriate current theories and practices of education and recreation service delivery.

Departmental-wide retreats to develop strategic plans or to provide SENTRY training will not be counted toward the 20 - 28 hours in this professional development area, but they can be counted toward the Bureau policies and procedures subsection (2) below.

Correspondence courses provide a viable way to keep abreast of current theories and practices in education and recreation professional fields.  With the Supervisor of Education and the Employee Development Manager's approval, selected correspondence courses may be counted toward the 20 - 28 professional training hours.

◆ Mandatory Bureau training that is not related specifically to the education/recreation discipline may not be applied to this 20 - 28 hours of training in this area.

◆ However, mandatory training courses offered at the MSTC that are related specifically to the education/recreation discipline such as teacher development, recreation/sports specialist training and education/recreation management training can be counted toward the 20 - 28 training hours in this area of training.

Cross development training in Education/Recreation Services taken by the new education and recreation staff and Spanish Immersion and Inmate Job Placement training taken by education/ recreation staff can be applied to meet the requirement in area (1).

Professional education/recreation staff must have 20 - 28 hours every three fiscal years relating to professional development.

   ◆   Clerical and support staff are encouraged to acquire training in relevant professional areas.

   (2)   **Bureau policies/procedures which specifically relate to the education/recreation discipline.**   This training's intent is to ensure that **all** education/recreation staff members are fully trained in relevant Bureau policies and procedures pertaining to education/recreation disciplines.  Examples of acceptable training include:

   ▪   SENTRY training for the VCCLEA and PLRA procedures,
   ▪   participation in **education/recreation** operational and program reviews.  The maximum amount of hours within a three fiscal year period from both types of review is **24** hours,
   ▪   GED test security procedures, or
   ▪   recreation-based security procedures, etc.

**All** education/recreation staff must complete 20 - 28 hours of training in this area every three fiscal years.

   j.   **Unit Team Participation.**   An education or recreation staff member must be assigned to serve as an education advisor on each unit team as outlined in the Program Statement on Inmate Classification and Program Review.

   k.   **Admission and Orientation Handbook.**   Each Education Department must develop an education handbook and make it available to all inmates during Admission and Orientation.

   ◆   Handbooks are to be updated at least every two years.

The handbook should give a brief overview of all education and recreation programs, the incentives and achievement awards system, and other pertinent information and include the VCCLEA and PLRA's literacy provisions.

A foreign language version of the education handbook (for example, Spanish) may be produced when 10 percent of the institution's inmates speak that foreign language and do not speak English.

   l. **Trade Advisory Committee.** A trade advisory committee is required when occupational training programs are not offered by outside accredited education institutions or are not certified or accredited by outside accrediting or certifying agencies.  When an entire education department is accredited or certified by an outside accrediting agency/organization, a trade advisory committee still is required to ensure individual program quality.

   The trade advisory committee's size and composition may vary according to local needs, but must include at least two active members who are not regular employees or institution contractors.

   The intent is to include representatives from trade organizations, accredited training institutions, or potential employers.

- ◆ These committees are to meet at least twice a year with at least one meeting conducted at the institution.
- ◆ Minutes from the trade advisory committee are to be prepared and maintained for three years.

   At least once a year, the committee members will assist the training instructor to review the curriculum, instructional delivery, equipment, and other relevant areas to ensure that the training program is comparable to community standards.  The review findings must be documented and maintained for three years.  This review process can be part of the meeting conducted at the institution.

11. **ATTENDANCE.**  The Supervisor of Education will monitor both unexcused and excused absences from school.

- ◆ Inmates are expected to attend class unless officially excused.

- ◆ The Supervisor of Education must watch for and correct patterns of program interruptions due to work details, sick calls, and other call-outs.

The Supervisor of Education is to ensure that all teachers maintain current class rolls.  Inactive class rolls are to be dated and archived for three years.  Institution and regional education staff will use these rolls for routine data maintenance and periodic program reviews.

12.  **INMATE EDUCATION RECORDS.**  An electronic education record is to be created and maintained to document inmate participation in education programs.  An education record consists of:

   a.  **Interview Record.**  Documents inmate education level, program interests, and related areas.  An interview record is not required for pretrial inmates.

   b.  **Program Review/Withdrawal Record.**  Documents the periodic reviews of inmates participating in literacy and other education programs.

   c.  **Justification of Exemption Record.**  Where applicable, documents program exemptions.

   d.  **Test Scores.**  Where applicable, documents literacy and ESL test scores.

   Appropriate certificates and diplomas, as specified in Section 7.b., may be issued to inmates to document their achievements in and completions of education programs.

13.  **PROGRAM REPORTS AND DEPARTMENT MEETINGS.**  By February 15th of each fiscal year, Supervisors of Education must submit an annual education program report to the Wardens of their institutions reflecting achievement of strategic goals in meeting the inmate population's education and program service needs.

   ◆   Copies are sent to the Central Office Education Administrator and Regional Education Administrator.

   ◆   A copy of the institution's education handbook and class schedules are to accompany each annual education program report.

   ◆   The Education Department is to maintain a copy of the annual education report for 10 years.

The Supervisor of Education must hold monthly education/recreation staff meetings.

The Supervisor of Recreation is to hold monthly staff meeting when recreation is a separate department.

   ◆   Minutes from these meetings will be sent to the Regional Education Administrator, the Central Office Education Administrator, the Warden, and the appropriate Associate Warden via BOPNet GroupWise.

Minutes may also be sent via GroupWise to other Supervisors of
Education or Supervisors of Recreation in the region.

    ◆       A copy of staff meeting minutes is to be
                 maintained in the Education/Recreation Department
                 for three years.

14.  **REVIEW OF STANDARDS.**  As part of the annual review and
certification process, Central Office education staff must review
these standards and definitions periodically (no less than once
every year) and ensure that they are revised and updated, as
necessary.

15.  **EDUCATION DATA SYSTEM (EDS).**  Supervisors of Education (or
Supervisors of Recreation where Recreation is a separate
department) are responsible for accurate and timely reporting of
the department's program activities in accordance with the most
current EDS guidelines.  Supervisors of Education (or Supervisors
of Recreation where Recreation is a separate department) must
provide EDS training for all department staff.

Regional Education Administrators are responsible for monitoring
the EDS data's validity and accuracy from their respective
regions and for promoting the EDS' managerial use.


                             /s/
                             Kathleen Hawk Sawyer
                             Director

# EXHIBIT D



**DISTRICT OF COLUMBIA**
**OFFICE OF THE STATE SUPERINTENDENT OF**
**EDUCATION**

## ADMINISTRATIVE DUE PROCESS COMPLAINT NOTICE
### IDEA Part B (ages 3-22)

This form is used to provide notice of a due process complaint to the Local Educational Agency (LEA) and/or State Educational Agency (SEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child, ages 3-22. **A party may not have a due process hearing until the party, or the attorney representing the party, files a due process complaint notice that meets the requirements of the Individuals with Disabilities Education Act (IDEA).** See 34 CFR Part 300 (IDEA Part B).

Parents initiating a complaint must provide a completed administrative due process complaint notice to the Local Educational Agency (LEA) and/or State Educational Agency (SEA), whomever the complaint is filed against. The Office of the State Superintendent (OSSE) is the SEA for the District of Columbia.

If the complaint is filed against a traditional public school, non-public day school, residential treatment facility or Public Charter School for which District of Columbia Public Schools (DCPS) is the LEA, notice to DCPS shall be provided to DCPS by e-fax at (202) 442-5115, with a copy to the Office of Dispute Resolution (ODR), 810 First Street, NE, 2nd Floor, Washington DC 20002 by hand delivery or by e-fax to (202) 478-2956.

If the complaint is filed against a Public Charter School and the Public Charter School is its own LEA, the due process complaint must be provided to the principal or director of the Public Charter School, with a copy to the ODR. You must contact the Public Charter School directly to find out how to provide the complaint to the Public Charter School.

If the complaint is filed against the Department of Youth Rehabilitation Services (DYRS), the due process complaint must be provided to James Brooks, Educational Specialist, Office of Education, DYRS, by email at JamesS.Brooks@dc.gov or fax at (202) 299-3622, with a copy to ODR.

If the complaint is filed against OSSE, the due process complaint must be provided to the OSSE's Office of General Counsel by fax at (202) 299-2134 (for more information call OSSE at (202) 724-7756), with a copy to ODR.

**A copy of the complaint must be provided to the Office of Dispute Resolution (ODR) on the same day that it is provided to the LEA, SEA and/or parent against whom the complaint was filed.** Failure to provide a copy to the ODR on the same day may result in a delay of assigning the case to a hearing officer. The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent, school system and/or OSSE knew or should have known about the alleged action that is the basis of the complaint.

Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Administrative Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

**LEGAL ASSISTANCE:**
A list of free legal help is available at www.osse.dc.gov >Programs > Office of Dispute Resolution > For Parents and Students > Free Legal Services. A paper copy of the list may be obtained by contacting the ODR at (202) 698-3819.

## A.   STUDENT INFORMATION

Name of Student: Stephon Brown          Date of Birth: 8/28/1996

Student's Gender (optional): _____     Race (optional): _____

Student's Address (if student is homeless, please provide available contact information):   Ward (1-8): 5

Mailing: FCI Hazelton, 1640 Sky View Dr., Bruceton Mills, W.V. 26525

Home: 174 Uhland Terrace NE, Washington, D.C., 20002

Home School: Dunbar High School     Attending School: Non-attending

Parent(s)/Guardian(s) of the Student: Sinceranee Brown

## B.   INDIVIDUAL MAKING COMPLAINT/REQUEST FOR DUE PROCESS HEARING

Name: Stephon Brown                    Home Phone: NA

Address: contact lawyer _____

_____

Email: NA _____          Fax: NA _____

**Relationship to Student:**
☐ Parent                              ☒ Self/Adult Student (age 18-22)
☐ Legal Guardian                      ☐ Local Education Agency (LEA)
☐ Parent Surrogate

## C.   LEGAL REPRESENTATIVE/ATTORNEY INFORMATON (if applicable):

Name/Firm: Sarah Comeau, School Justice Project

Address: 1805 7th St NW, 7th Floor

Washington, DC 20001

Work Phone: (202)618-1247   Email: scomeau@sjpdc.org Fax: (202)204-5838

## D.   COMPLAINT INFORMATION (check all that apply):

**Complaint made against (check all that apply):**
☒ DCPS Public School(s) (name): DCPS as the LEA
☐ Residential Treatment Facility (name): _____
☐ Public Charter School (when the Public Charter School is its own LEA) (name): _____
☐ Public Charter School (when DCPS is the LEA) (name): _____
☐ DYRS
☐ Non-public school (s) (name): _____
☒ Office of the State Superintendent of Education (OSSE)
☐ Parent
☒ Federal Bureau of Prisons